IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Lurie Taylor, | ) | C/A No.: 1:11-1834-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

In November 2008, Plaintiff filed applications for DIB and SSI under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383c. Tr. at 140–41, 149–57. In

his DIB application, he alleged his disability began on July 15, 2008. Tr. at 140. In his SSI application, he alleged his disability began on July 19, 2008. Tr. at 149. His applications were denied initially and upon reconsideration. Tr. at 78, 81, 83, 85. On June 11, 2010, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 30–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 1, 2010, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 21–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 28, 2011. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 25 years old at the time of the hearing. Tr. at 36. He completed the 11th grade. Tr. at 38. His past relevant work ("PRW") was as a brick press operator, lumber sorter, auto detailer, poultry trimmer, material handler, forklift operator, and fast-food employee. Tr. at 65–66. He alleges he has been unable to work since July 2008. Tr. at 140, 149.

2.    Medical History

Plaintiff received his primary care treatment from Javier Carles, M.D. at Laurens Family Practice Associates. The first treatment note from this facility is dated August 28, 2006 when Plaintiff was seen for a head injury. Tr. at 262.

On March 13, 2007, Dr. Carles treated Plaintiff for several draining lesions on his back. *Id.* Plaintiff reported sometimes having lesions under his arm and in his ano/genital area. *Id.* Dr. Carles diagnosed hidradenitis suppurativa and prescribed prednisone, tetracycline, and Kenalog cream. *Id.* At a follow-up appointment on April 19, 2007, Dr. Carles indicated that Plaintiff's lesions were better and he continued Plaintiff's medications. Tr. at 261. On May 19, 2007, Plaintiff was treated for tingling and numbness in his left hand and fingers as well as shooting pains in his arm. *Id.*

Plaintiff was treated in the emergency room on August 7, 2007[1] for multiple abscesses on his thighs and back. Tr. at 362–63. The abscesses were incised and drained. *Id.*

On February 26, 2008, Dr. Carles treated Plaintiff for a draining area on his back, but noted no induration (hardening) or significant cellulitis (infection). Tr. at 271. Plaintiff was having polyuria (excessive urine) and polydipsia (excessive thirst). *Id.* His fingerstick blood sugar was 340. *Id.* In addition to an abscess, Dr. Carles diagnosed new onset diabetes mellitus. *Id.* He prescribed Januvia/metformin and discussed a diabetic diet. *Id.* Dr. Carles treated Plaintiff in follow-up for his diabetes on March 19, 2008. Tr. at 270. Plaintiff reported tolerating Janumet and no episodes of hypoglycemia. *Id.* Plaintiff continued to have an area still draining on his back. *Id.*

---

[1] Although Plaintiff represents this visit occurred on August 7, 2007, the date is not completely legible. Tr. at 362.

On June 23, 2008, Plaintiff saw Dr. Carles complaining of arm and shoulder discomfort. Tr. at 268. Dr. Carles diagnosed diabetes mellitus and bicipital tendonitis. *Id.* He advised prescribed Naproxen and advised Plaintiff to use ice. *Id.*

Plaintiff visited the emergency room on July 12, 2008 with a chief complaint of a toothache. Tr. at 359.

Plaintiff saw Dr. Carles again on August 4, 2008 for diabetes follow up. *Id.* His blood sugar was 233 and he weighed 248 pounds.[2] *Id.* Dr. Carles continued Plaintiff's prescription for Janumet and started Plaintiff on lisinopril for hypertension. *Id.*

On November 4, 2008, Dr. Carles noted that Plaintiff was "doing well." Tr. at 266. He considered Plaintiff's diabetes to be "controlled" and continued Plaintiff's prescription for Janumet. *Id.* Plaintiff's blood pressure was elevated and Dr. Carles prescribed Altace. *Id.* He noted that Plaintiff had a little cyst area underneath his left arm pit. *Id.* Dr. Carles drained the cyst, noted that Plaintiff had an element of hidradenitis suppurativa, and prescribed Plaintiff doxycycline. *Id.*

Plaintiff was treated in the emergency room on December 10, 2008 for bilateral axillae cysts, diagnosed with hidradenitis suppurativa, and advised to continue his medications. Tr. at 360–61.

On December 10, 2008, Dr. Carles incised and drained the abscess that Plaintiff complained of in the emergency room and injected it with Kenalog. Tr. at 278. Dr.

---

[2] A portion of this record is illegible. It notes that Dr. Carles asked Plaintiff about the foods he eats, but the summary of Plaintiff's response is not legible. Tr. at 268.

Carles advised Plaintiff to take Levaquin and then restart doxycycline. *Id.* Dr. Carles also prescribed Lortab for pain. *Id.*

On December 16, 2008, Dr. Carles treated Plaintiff for chronic hidradenitis suppurativa. Tr. at 277. Although a treated area was better, Plaintiff had developed a new linear abscess. *Id.* Dr. Carles noted that Plaintiff could not get his prescription for Levaquin filled because it was not on the formulary list. *Id.* He further noted that he did not know whether Plaintiff had been using minocycline regularly, but restarted it because it had been helpful in the past. *Id.*

Plaintiff reported to the emergency room on February 9, 2009, for nasal congestion, a cyst under his left arm, and a rash "all over." Tr. at 293. Plaintiff was prescribed Levaquin and discharged with instructions to seek follow-up treatment. Tr. at 294. The treating physician provided a work release stating Plaintiff could return to work on February 12, 2009. Tr. at 295.

Plaintiff was treated in the emergency room on April 21, 2009 for weakness and dizziness. Tr. at 354. It was also noted that Plaintiff had recurrent abscesses. *Id.*

On April 22, 2009, Vincent Green, M.D., at Laurens Family Practice evaluated Plaintiff's uncontrolled blood sugars. Tr. at 319. Plaintiff reported urinating more frequently, but not having any weakness, dizziness, or other symptoms. *Id.* Dr. Green determined that Plaintiff should start insulin therapy and prescribed Lantus 10 units. *Id.*

Plaintiff saw Dr. Green again on April 28, 2009, for evaluation of his poorly-controlled diabetes. Tr. at 318. Plaintiff had not been taking some of his medication

regularly because of insurance issues and his blood sugar was 374. *Id.* Plaintiff also complained of erectile dysfunction. *Id.* Dr. Green increased Plaintiff's Lantus to 30 units, advised continuation of his other medications, and called Plaintiff's insurance company. *Id.*

On May 1, 2009, Dr. Carles indicated that Plaintiff was doing "fairly well." Tr. at 317. Plaintiff had a small cyst on his back, but Dr. Carles noted that Plaintiff's back was as good as he had seen it. *Id.* Dr. Carles noted that Plaintiff kept asking about disability.[3] *Id.*

On May 4, 2009, Plaintiff presented with a blood sugar level of 358 and Dr. Carles indicated that he did not know why there had been such a decline in Plaintiff's glycemic control. Tr. at 316. Dr. Carles increased Plaintiff's Lantus to 40 units and continued his other medications. *Id.* Dr. Carles treated Plaintiff for his diabetes again on May 13, 2009. Tr. at 315. Plaintiff's blood sugar was "better" at 276. *Id.* Dr. Carles increased Plaintiff's Lantus to 50 units and added Actos. *Id.*

On June 5, 2009, Plaintiff was treated in the emergency room for an abscess on his back and hypoglycemia. Tr. at 346–50.

The following day, Plaintiff saw Melmoth Patterson, M.D., at Laurens Family Practice. Tr. at 314. Plaintiff's blood sugar was 450 and he had an abscess on his left buttocks. *Id.* Dr. Patterson opined that Plaintiff was hyperglycemic secondary to the new

---

[3] While this record is not completely legible, it appears that Dr. Carles also questioned Plaintiff's motivation to keep his blood sugar low in light of his questions about obtaining disability benefits. Tr. at 317.

onset of infection. *Id.* Although Plaintiff was supposed to take Lantus every night along with his other medications, Dr. Patterson noted that he had not taken it the prior night, "which was a mistake." *Id.*

In a visit on June 10, 2009, Dr. Carles noted that Plaintiff had recently begun having trouble controlling his blood sugars, but reported doing what was asked of him in diabetic education. Tr. at 313. Dr. Carles indicated that Plaintiff was previously well controlled on less than his current medications. *Id.* He increased Plaintiff's Lantus to 70 units. *Id.*

Plaintiff was treated in the emergency room on June 20, 2009 for right knee pain and skin rash.[4] Tr. at 356–57.

On June 24, 2009, Dr. Carles indicated that Plaintiff's blood sugars were "still running a little on the high side," but were better than they were before. Tr. at 312. He diagnosed uncontrolled diabetes mellitus and noted that he thought there were "some compliance issues with either medication or diet." *Id.* Dr. Carles noted that Plaintiff had stopped taking Actos because he could "not tolerate it" and recommended Plaintiff follow a diabetic diet. *Id.* He also diagnosed hidradenitis suppurativa and indicated that this was a "bad combination for him since he has diabetes mellitus." *Id.*

Plaintiff was treated in the emergency room on July 7, 2009 for a painful back abscess, Tr. at 342–45, and on July 17, 2009 for acute exacerbation of chronic back pain.

---

[4] Although Plaintiff represents this visit occurred on June 20, 2009, the date is not completely legible. Tr. at 356.

Tr. at 339–41.  He was treated in the emergency room again in November or December 2009[5] for rectal bleeding.  Tr. at 330–31.

On December 22, 2009, Plaintiff was treated in the emergency room for 1st and 2nd degree burns on his left arm and left leg.  Tr. at 328–29.  He was prescribed Lortab for pain.  Tr. at 329.  Plaintiff returned to the emergency room on December 24, 2009 because he was out of pain medication.  Tr. at 326–27.  He was noted to need additional debridement.  Tr. at 326.

Plaintiff was treated in the emergency room on January 5, 2010 for an abscess.  Tr. at 324–25.  The next day, Dr. Carles treated Plaintiff for pain in his right axillary area, but noted there was no evidence of abscess.  Tr. at 367.  Dr. Carles prescribed Lortab for pain.  *Id.*

Plaintiff returned to the emergency room the next day complaining that he was out of pain medication.  Tr. at 324.  The provider noted that Plaintiff's wound from two days earlier was no longer abscessed and was healing well.  Tr. at 324–25.

On January 21, 2010, Dr. Green evaluated Plaintiff for complaints of low back pain.  Tr. at 366.  Plaintiff stated the pain was not radiating and he had not been taking anything for it.  *Id.*  He also stated that he had taken one of his aunt's Lortab the prior night and had slept well.  *Id.*  Plaintiff exhibited a normal range of motion, normal strength, no sensory deficits, a normal gate, and very minimal tenderness in his low back.  *Id.*  Dr. Green advised Plaintiff that he did not see any need for narcotic pain relief.  *Id.*

---

[5] The date on the record is not clear.  Tr. at 330.

Plaintiff was treated in the emergency room on January 26, 2010 for painful left axillae abscess. Tr. at 321–23. The provider noted that it did not appear that there was anything to incise and drain. Tr. at 323.

Plaintiff saw Dr. Carles on February 18, 2010 for rectal bleeding and an abscess on his back. Tr. at 366. Plaintiff would not allow the doctor to perform a prostate exam or anoscopy. *Id.* Plaintiff reported compliance with his diabetes treatment, but his diabetes was not controlled. *Id.* Dr. Carles increased Plaintiff's insulin from 70 to 100 and expressed sebaceous material from Plaintiff's abscess. *Id.*

On February 25, 2010, Dr. Carles treated Plaintiff for back pain and a draining abscess under his left arm. Tr. at 365. Dr. Carles noted that when Plaintiff's Lantus was increased to 120 units, his blood sugars were under 200. *Id.* Dr. Carles continued Plaintiff's current dose of Lantus and prescribed Lortab for pain. *Id.*

On April 13, 2010, Dr. Carles executed a statement prepared by Plaintiff's counsel summarizing his opinion. Tr. at 369–70. He stated that Plaintiff had two serious problems that made it hard for him to function predictably in a work setting. Tr. at 369. He described Plaintiff as having a "brittle form of insulin diabetes" and stated that despite Plaintiff's best efforts at controlling diet, exercise, and medication, his blood sugar numbers would vary unpredictably. *Id.* Dr. Carles stated that Plaintiff's hidradenitis suppurativa resulted in frequent boils and abscesses in his underarm and groin that are "fairly distracting when they occur" and cause his blood sugar to go further out of control. *Id.* Dr. Carles opined that active boils would affect Plaintiff's concentration and

he would have problems reaching with an affected arm or walking with an affected groin on more than an occasional basis.  *Id.*  The doctor noted that Plaintiff did not come into the office for every boil and was having them more frequently than the medical records reflect.  *Id.*  Dr. Carles further opined that Plaintiff's blood sugar could affect his ability to attend to or concentrate on any work and that between his two conditions, he would almost certainly be unavailable to work more than three days on average out of any month.  *Id.*

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

             a.     Plaintiff's Testimony

At the June 11, 2010 hearing, Plaintiff testified that he had constant pain throughout his body at level 9 out of 10.  Tr. at 50.  He also described symptoms of numbness, fatigue, difficulty concentrating, blurred vision, bladder infections, constant thirst, and skin lesions.  Tr. at 50–52.  He stated that he tried to do light chores around the house like washing and sweeping, but he spent most of the day laying down.  Tr. at 42, 56.  He said his wife had to help him shower and dress and that his pain prevented him from spending time with his kids.  Tr. at 41, 51.  He testified he had pain regardless of whether he sat or stood.  Tr. at 54.  He said he could sit for 30 minutes to an hour at one time and for one-and-a-half to three hours total in an eight-hour workday; stand for 30 minutes to an hour at one time and for one-and-a-half to three hours total in an eight-hour workday; walk 10 to 12 steps at one time and for three hours total in an eight-hour

workday; and lift a gallon of milk.  Tr. at 54–56.  He stated that picking up his son, who weighs 40 to 45 pounds took a lot out of him and he could not consistently carry a 20-pound bag.  Tr. at 57.

Plaintiff testified that he last worked at McDonald's for about nine months in 2009 where he cooked and helped clean.  Tr. at 44–45.  He stated he did not clean tables or ring up purchases.  Tr. at 45.  He testified that the longest he has worked since he left school was three years on and off with fast food restaurants.  Tr. at 47.

### b.     Vocational Expert Testimony

Vocational Expert ("VE") Adger Brown reviewed the record and testified at the hearing.  Tr. at 63–72.  The VE categorized Plaintiff's PRW as a brick press operator as medium, semi-skilled work; as a lumber sorter as heavy, unskilled work; as an auto detailer as medium, unskilled work; as a poultry trimmer as light, unskilled work; as a material handler as heavy, semi-skilled work; as a forklift operator as medium, semi-skilled work; and as a fast foods worker as light, unskilled work.  Tr. at 65–66.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry over 50 pounds occasionally and 25 frequently; and could not repetitively stoop, twist, crouch, kneel, climb stairs or ramps, crawl, balance, or climb ladders, ropes, or scaffolds.  Tr. at 66.  The VE testified that the hypothetical individual could perform all of Plaintiff's PRW except lumber sorter and material handler.  *Id.*  The ALJ then limited the hypothetical individual to no lifting over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, twisting, crouching, kneeling, climbing of

stairs or ramps, and crawling or balancing; and no climbing of ladders, ropes, or scaffolds. Tr. at 67. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW as a poultry trimmer or fast-food worker. *Id.* The ALJ's third hypothetical limited the individual to no lifting or carrying over 10 pounds occasionally and less than 10 pounds frequently; no standing or walking over more than an aggregate of two hours in an eight-hour workday; no more than occasional stooping, twisting, balancing, crouching, kneeling, climbing of stairs or ramps; and no crawling or climbing of ladders, ropes, or scaffolds. *Id.* The VE stated that the hypothetical individual could not perform any of Plaintiff's PRW, but could perform the following sedentary, unskilled jobs: parts packer (DOT 920.687-030) (100 jobs in South Carolina; 6,600 nationally); quality control examiner (DOT 739.687-182) (450 jobs in South Carolina; 14,000 nationally); food order clerk (DOT 209.367-014) (2,300 jobs in South Carolina; 145,000 nationally). Tr. at 67–68.

Plaintiff's counsel then presented a hypothetical based on the opinion of Plaintiff's treating physician. Tr. at 69. Counsel restricted the hypothetical individual to most probably missing more than three days of work per month because of his medical conditions. Tr. at 70. The VE stated that such a person could not engage in substantial gainful activity. *Id.* Upon further questioning by Plaintiff's counsel, the VE testified that a hypothetical individual whose problems with attention and concentration interrupted his work tasks during two-thirds of the workday would not be able to work. *Id.*

2.　　　The ALJ's Findings

In his July 1, 2010 decision, the ALJ made the following findings of fact and

conclusions of law:

1.　　　The claimant meets the insured status requirements of the Social Security
Act through June 30, 2009.
2.　　　The claimant has not engaged in substantial gainful activity since July 19,
2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et
seq.*).
3.　　　The claimant has the following severe impairment: diabetes and
hidradenitis supporative (20 CFR 404.1520(c) and 416.920(c)).
4.　　　The claimant does not have an impairment or combination of impairments
that meets or medically equals one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926).
5.　　　After careful consideration of the entire record, I find that the claimant has
the residual functional capacity to perform work with restrictions that
require no lifting or carrying over 20 pounds occasionally and 10 pounds
frequently and no more than occasional stooping, twisting, crouching,
kneeling, crawling, balancing, or climbing.
6.　　　The claimant is capable of performing past relevant work as a fast food
worker.　　This work does not require the performance of work-related
activities precluded by the claimant's residual functional capacity (20 CFR
404.1565 and 416.965).
7.　　　The claimant has not been under a disability, as defined in the Social
Security Act, from July 19, 2008, through the date of this decision (20 CFR
404.1520(f) and 416.920(f)).

Tr. at 23–27.

　　　　　D.　　　Appeals Council Review

Although Plaintiff submitted extensive additional records to the Appeals Council,

he admits that some of the additional records submitted were not relevant to the period

13

considered by the ALJ.[6]  [Entry #20 at 11].  Instead, he focuses on the treatment records of Jeffrey B. Thomas, M.D.  *Id.*

Plaintiff saw Dr. Thomas at Advanced Surgical Associates on January 12, 2009. Tr. at 458.  Plaintiff was noted to have referred himself to Dr. Thomas for evaluation and consideration of surgical excision because his wife was previously treated at the facility. *Id.*  Plaintiff complained of abscesses in the left axillary region for two months, although he did not have any active abscesses.  *Id.*  Dr. Thomas noted that Plaintiff was obese, alert and oriented, and had an appropriate affect.  Tr. at 459.  He observed no cellulitis or fluctuance, and minimal tenderness in Plaintiff's left axillary region.  *Id.*  Dr. Thomas discussed observation versus surgical intervention with Plaintiff and recommended that Plaintiff complete antibiotic treatment before proceeding with surgical intervention.  *Id.*

Plaintiff saw Dr. Thomas again on August 19, 2010 for a painful lump on his lower back, Tr. at 457, and on August 23, 2010 for swelling and pain in the left axilla when he underwent incision and draining of an abscess.  Tr. at 456.  The most recent record from Dr. Thomas is dated November 10, 2010 and indicates Plaintiff complained of a left axillary abscess that was incised and drained.  Tr. at 375.  Dr. Thomas noted Plaintiff presented with the name of Lurie Taylor rather than Anthony Taylor, the name he previously used.  *Id.*

---

[6] The undersigned's review of the records submitted to the Appeals Council demonstrates that a majority of them post-dated Plaintiff's date last insured of June 30, 2009.  Tr. at 377–451, 464–540.  Furthermore, many of the documents are illegible.  *See* Tr. at 464–519.

The records submitted to the Appeals Council also document Plaintiff's treatment for a pilonidal cyst in 1999. Tr. at 460.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ erred in discounting the opinion of Dr. Carles;

2)      The ALJ failed to consider Plaintiff's impairments in combination;

3)      The ALJ improperly discounted Plaintiff's subjective complaints;

4)      The ALJ improperly relied on the testimony of the VE;

5)      New and material evidence was submitted to the Appeals Council that must be weighed by a factfinder.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[7] (4) whether such impairment prevents claimant from performing PRW;[8] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[7] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[8] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the

findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    The ALJ Should Further Consider Plaintiff's Impairments in
Combination

Plaintiff contends the ALJ erred by failing to consider his impairments in combination. [Entry #18 at 28–29]. The Commissioner did not address this argument in his response brief.

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp.2 d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

In this case, the ALJ addressed Plaintiff's diabetes and hidradenitis supporativa in his RFC assessment and referenced Dr. Carles's opinion that Plaintiff's abscesses would

19

"usually cause the claimant's blood sugar to go further out of control."  Tr. at 24–25.

Other than his reference to Dr. Carles's opinion, the only finding the ALJ made regarding

the combined effects of Plaintiff's impairments was the conclusory statement that "the

claimant does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments."  Tr. at 24.  Such a statement is not

sufficient under the law to discharge the ALJ's obligation to consider the effect of

Plaintiff's combined limitations.  *See Walker*, 889 F.2d at 50 (such a "finding in itself,

however, is not sufficient to foreclose disability.").  Nowhere does the ALJ discuss

whether and how he considered the combined cumulative effect of Plaintiff's limitations

and whether, together, the limitations rendered him disabled.  *Id.* (holding ALJ must

"adequately explain his or her evaluation of the combined effect of the impairments.").

Therefore, the undersigned recommends this matter be remanded to the ALJ so

that he can examine the combined effect of Plaintiff's impairments.  In his decision on

remand, the ALJ should explain his evaluation of the combined effect of Plaintiff's

impairments in accordance with Fourth Circuit law.

### 2. The ALJ's Finding Regarding Plaintiff's PRW was Flawed

Plaintiff was denied disability based on the ALJ's finding that he could perform

his PRW as a fast food worker.  Tr. at 27.  Plaintiff argues that the VE improperly

characterized his PRW as a "fast food worker" rather than as a "fast food cook."  [Entry

#18 at 33–34].  Plaintiff further argues that the ALJ's determination that Plaintiff could

return to his PRW as a fast food worker is, therefore, not supported by substantial

evidence. *Id.* Plaintiff also argues that the ALJ erred by failing to ask the VE whether his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). *Id.* at 33. The Commissioner contends Plaintiff has identified no apparent conflict between the VE's testimony and the DOT and that any error in the ALJ failing to inquire whether the VE's testimony was consistent with the DOT was harmless. [Entry #19 at 9–10]. The Commissioner also generally argues that the ALJ's denial of benefits at step four is supported by substantial evidence, but fails to address Plaintiff's argument that the VE improperly characterized his PRW. *Id.*

SSR 82-62 sets forth the procedures the SSA uses at step four of the sequential analysis when determining whether the claimant's RFC permits him to return to his PRW. The ALJ must consider whether a claimant has the RFC to "meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy)," and, if the claimant can return to his PRW, he may be found to be not disabled. SSR 82-62.

In a Work History Report dated November 22, 2008, Plaintiff indicated he worked at Burger King and Wendy's as a cook. Tr. at 184, 189. In a description of his work at Burger King, Plaintiff stated, "I was a cook. I cooked all day." Tr. at 189.

At the hearing, the VE testified that Plaintiff's PRW included work as a "fast foods worker, DOT 311.472-010, unskilled, SVP of two and light." Tr. at 66. The ALJ

found that claimant was capable of performing his PRW "as a fast food worker (DOT 311.472-010) for Wendy's and for Burger King." Tr. at 27.

The DOT classifies employment as a fast food worker as light and provides the following description for 311.472-010:

> Serves customer of fast food restaurant: Requests customer order and depresses keys of multicounting machine to simultaneously record order and compute bill. Selects requested food items from serving or storage areas and assembles items on serving tray or in takeout bag. Notifies kitchen personnel of shortages or special orders. Serves cold drinks, using drink-dispensing machine, or frozen milk drinks or desserts, using milkshake or frozen custard machine. Makes and serves hot beverages, using automatic water heater or coffeemaker. Presses lids onto beverages and places beverages on serving tray or in takeout container. Receives payment. May cook or apportion french fries or perform other minor duties to prepare food, serve customers, or maintain orderly eating or serving areas.

DOT 311.472-010. Plaintiff contends his PRW should have been characterized as a fast food cook, which the DOT classifies as medium work with the following description:

> Prepares and cooks to order foods requiring short preparation time: Reads food order slip or receives verbal instructions as to food required by patron, and prepares and cooks food according to instructions. Prepares sandwiches [SANDWICH MAKER (hotel & rest.) 317.664-010]. Prepares salads and slices meats and cheese, using slicing machine, [PANTRY GOODS MAKER (hotel & rest.) 317.684-014]. Cleans work area and food preparation equipment. May prepare beverages [COFFEE MAKER (hotel & rest.) 317.684-010]. May serve meals to patrons over counter.

DOT 313.374-010.

Plaintiff's description of his PRW as a "cook" at Wendy's and Burger King and his description of his work at Burger King as "cook[ing] all day" demonstrate that the VE, and subsequently the ALJ, erred in evaluating his PRW under DOT 311.472-010.

22

Based on a comparison of the provisions, the job of fast food cook (DOT 313.374-010) appears to correspond to the work Plaintiff described.

While the differences in these two jobs suggest more than a scrivener's error, even assuming the VE and the ALJ intended refer to DOT 313.374-010, Plaintiff's RFC determination renders him unable to perform the work of a fast food cook. In determining Plaintiff's RFC, the ALJ found Plaintiff could lift or carry over 20 pounds occasionally and ten pounds frequently. Tr. at 24. This is considered "light" work under the regulations. 20 C.F.R. §§ 404.1567(b), 416.967(b). The DOT classifies the work of a "fast food cook" as medium in exertion. DOT 313.374-010. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. *Id.* Thus, in light of the ALJ's RFC determination, Plaintiff is no longer able to perform the work of a fast food cook.

Following his determination at step four that Plaintiff could perform his PRW as a fast food worker, the ALJ noted that even if Plaintiff could not return to PRW, the Medical-Vocational Guidelines ("Grids") direct a finding of "not disabled." Tr. at 27. The undersigned anticipates the Commissioner will argue that any error in classifying Plaintiff's PRW was harmless error in light of this finding.

The Grids consider only the exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. *Walker*, 889 F.2d at 49. "Exertional limitations" exist "[w]hen the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as

23

pain, affect only [his] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). A nonexertional limitation "is a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not, such as mental retardation, mental illness, blindness, deafness or alcoholism" and is "present at all times in a claimant's life, whether during exertion or rest." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983) (footnotes omitted). A nonexertional limitation does not directly affect the claimant's exertional abilities—the ability to sit, stand, walk, lift, carry, push, or pull; rather, nonexertional limitations affect the mind, vision, hearing, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use the fingers for fine activities. *See* 20 C.F.R. § 404.1569a(c). "Thus, it is the nature of the claimant's limitations, not certain impairments or symptoms, that determines whether the claimant will be found to have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions." SSR 96–9p.

When a claimant suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, the ALJ may not rely exclusively on the Grids to establish that the claimant could perform other work that exists in the national economy. *See Walker*, 889 F.2d at 49; *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) ("When nonexertional limitations . . . occur in conjunction with exertional limitations, the guidelines are not to be treated as conclusive.") (citing *Roberts v.*

*Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); 20 C.F.R. Pt. 404, Subpt. P, App. 2 §

200.00(a), (d)-(e)(2); 20 C.F.R. § 404.1569)); *Hammond v. Heckler*, 765 F.2d 424, 425–

26 (4th Cir. 1985) ("[T]he grids inadequately describe[ ] the claimant who suffers a

disability present in the absence of physical exertion."); 20 C.F.R. § 404.1569a(d).

Rather, in those circumstances, the Commissioner has the burden to prove by expert

vocational testimony—not exclusive reliance on the Grids—that, despite the claimant's

combination of exertional and nonexertional impairments, specific jobs exist in the

national economy that the claimant can perform. *Grant v. Schweiker*, 699 F.2d 189, 192

(4th Cir. 1983).

In his RFC determination, the ALJ found that Plaintiff was restricted to no more

than occasional stooping, twisting, crouching, kneeling, crawling, balancing, or climbing.

Tr. at 24. These are nonexertional limitations. *See* 20 C.F.R. § 404.1569a(c)(vi). In an

attempt to bring Plaintiff's case in line with the Grids, the ALJ found the following:

> Stooping and bending are required only occasionally in light work,
> crouching is not required in light work; some limitation in climbing and
> balancing is not significant, and kneeling and crawling limitations do not
> have a significant impact (Social Security Rulings 83-14 and 85-15).

Tr. at 27.

SSR 83-14 provides that a "particular additional exertional or nonexertional

limitation may have very little effect on the range of work remaining that an individual

can perform" a claimant "comes very close to meeting a table rule which directs a

conclusion of 'Not disabled.'" SSR 83-14. The regulation notes, however, that the use

of a vocational resource may be helpful even in those cases that appear to be "obvious." *Id.* Furthermore, although the ALJ states that "some limitation in climbing and balancing is not significant," SSR 85-15 indicates such limitations may rule out certain occupations and recommends use of a VE where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine. SSR 85-15. While the use of a VE may not always be necessary even where a claimant has both exertional and nonexertional limitations, *Garrett v. Astrue*, No. 0:10–2454, 2012 WL 174655, at *4 n.5 (D.S.C. Jan 20, 2012), the undersigned recommends finding that the ALJ's conclusory statements regarding the impact of Plaintiff's nonexertional limitations does not bring this case within the Grids. Thus, the ALJ's alternative conclusion that the Grids direct a finding of "not disabled" does not save the ALJ's deficient analysis of Plaintiff's PRW.

The VE's testimony that there was other work in the economy that a hypothetical individual of Plaintiff's vocational profile who was limited to sedentary work could perform is likewise insufficient to save the flawed PRW analysis. *Hall v. Commissioner of Social Sec.*, No. 6:09-908, 2010 WL 1252180, at *6 (M.D. Fl. March 26, 2010). "The ALJ's error in determining past relevant work in this case is a fatal flaw because that is where the ALJ's findings and analysis ended." *Id.* at *9. Doing anything more than remanding the case "would necessarily require the court to impermissibly reweigh the evidence and make its own findings on matters not considered by the ALJ in his decision." *Id.*

For the foregoing reasons, the undersigned recommends remanding this matter for testimony and findings consistent with Plaintiff's PRW and, if necessary, additional findings regarding Plaintiff's ability to perform other jobs existing in significant numbers in the economy. If the ALJ utilizes the testimony of a VE on remand, he should ask whether the VE's testimony is consistent with the DOT.

### 3.     Plaintiff's Remaining Allegations of Error

In light of the undersigned's recommendation to remand on the foregoing issues, it is not necessary to address Plaintiff's remaining allegations of error. On remand, however, the ALJ is directed to consider any relevant evidence submitted to the Appeals Council in assessing Dr. Carles's opinion and Plaintiff's subjective complaints. The undersigned notes that the recommendation of remand is in no way intended to suggest that the ALJ erred in discounting the opinion of Dr. Carles or in finding Plaintiff less than fully credible.

Although the undersigned does not make a determination as to whether the evidence submitted to the Appeals Council alone warrants remand, the undersigned finds unpersuasive Plaintiff's argument that Dr. Thomas's treatment records rebut a significant reason provided by the ALJ for finding the Plaintiff less than fully credible. [Entry #20 at 10–11]. In finding Plaintiff "not fully credible," the ALJ noted that he was treated by Dr. Carles and had "not been referred to a dermatologist, which seems unlikely if claimant was in such pain and had such frequent abscesses as his testimony would

indicate." Tr. at 26–27. Dr. Thomas's 2009 treatment records do not rebut the ALJ's statement because they provide that Plaintiff "referred himself" for treatment. Tr. at 458.

## III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

October 30, 2012                                    Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).